[Cite as *State v. Escobedo*, 2023-Ohio-3410.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio/City of Bowling Green

    Appellee

v.

Daniel Escobedo &
Matthew James Robinette

    Appellants

Court of Appeals Nos. WD-23-009
WD-23-010

Trial Court Nos.  22CRB01477
22CRB01957

**<u>DECISION AND JUDGMENT</u>**

Decided:  September 22, 2023

* * * * *

Alyssa M. Blackburn, Bowling Green City Prosecuting Attorney, and
Nicholas P. Wainwright, Assistant Prosecuting Attorney, for appellee.

Scott T. Coon, for appellant, Daniel Escobedo.

Rodney A. Fleming, for appellant, Matthew James Robinette.

* * * * *

**ZMUDA, J.**

## I.    Introduction

**{¶ 1}** In this consolidated appeal, appellants Daniel Escobedo and Matthew James

Robinette appeal the judgment of the Bowling Green Municipal Court, denying their

respective motions to suppress evidence obtained when Ohio liquor control agents stopped them and requested identification, following the appellants' purchases of alcohol. Finding no error, we affirm the trial court's judgments.

## II.     Facts and Procedural Background

{¶ 2} In the fall of 2022, liquor control agents, working for the Ohio Investigative Unit of the Ohio Department of Public Safety conducted surveillance of the Campus Mart in Bowling Green, Ohio.  Campus Mart is a liquor permit holder, located in a neighborhood comprised primarily of student housing for Bowling Green State University (BGSU), and is a location known to law enforcement for sales to underage customers.

{¶ 3} On September 10, 2022, an agent posed as a store patron and observed Escobedo purchase two cases of alcoholic beverages using "some sort of identification." The agent noted Escobedo's youthful appearance, based on observation of "his build and development."  As Escobedo exited the store and entered his vehicle, two other agents approached him and asked to see identification.  Escobedo's driver's license indicated he was under the age of 21.

{¶ 4} On November 12, 2022, liquor control agents were again conducting operations at Campus Mart.  Agents observed Robinette as he exited the store carrying a bottle of vodka, and after determining Robinette appeared youthful, two agents

2.

approached Robinette in his vehicle and asked for identification. Robinette also produced identification indicating he was under the age of 21.

{¶ 5} Both Escobedo and Robinette were charged with violating Bowling Green Municipal Code 96.02(D), which provides, in pertinent part:

> No underage person shall knowingly order, pay for, share the cost of, attempt to purchase, possess, or consume any beer or intoxicating liquor in any public or private place.[1]

Additionally, Robinette was charged with furnishing alcohol to an under-aged person, a violation of R.C. 4301.69(A). Escobedo and Robinette each filed motions to suppress, challenging the stops by liquor control agents to request identification, arguing the stops were without sufficient cause.

{¶ 6} On January 12, 2023, the trial court held separate hearings on the motions to suppress.

{¶ 7} In Escobedo's case, liquor control agents Stevie Hescht, Haley Wade, and Sarah Valasek testified on behalf of the state. According to the testimony, the agents

---

[1] Both were initially charged with a violation of R.C. 4301.69(E)(1), which mirrors the language of B.G.M.C. 95.02(D) in prohibiting an underage person to "knowingly order, pay for, share the cost of, attempt to purchase, possess, or consume any beer or intoxicating liquor in any public or private place." R.C. 4301.69(E)(1). Prior to the change of plea, the state amended the charges to violation of B.G.M.C. 95.02(D), with an additional charge against Escobedo for possessing a fictitious ID, which the state dismissed at sentencing.

3.

were conducting a routine field investigation of the Campus Mart, a permitted location. Agent Wade testified that the Campus Mart had sold to underage customers in the past, with numerous illegal sales at that location each year.

{¶ 8} On September 10, 2022, Agent Hescht posed as a patron in the store and observed Escobedo approach the cashier with two cases of different types of alcohol, show "some sort of identification," complete his purchase, and exit the store. Agent Hescht indicated the cashier looked at the identification "quickly" and Hescht, herself, could not see the identification from her position several feet away.

{¶ 9} Once Escobedo exited the store and got into his vehicle, Agent Wade and her partner approached the vehicle on foot, with Agent Wade positioned on the passenger's side, where Escobedo was seated, and her partner on the driver's side, where Escobedo's roommate was seated. Agent Wade asked Escobedo for his identification and Escobedo showed his driver's license, indicating he was under the age of 21. When asked for the identification used to purchase alcohol, Escobedo produced a fictitious identification.

{¶ 10} Both agents Hescht and Wade testified regarding their experience as law enforcement officers, and their observations of Escobedo's youthful appearance, based on that experience. Agent Hescht indicated Escobedo appeared youthful, based on her training and experience, considering Escobedo's "overall make up and development." Agent Wade indicated Escobedo's appearance was youthful looking, based on his stature,

4.

clothing, lack of muscle and fat development, and lack of facial hair. Both agents testified that there is no specific training or test to measure or define a youthful appearance, comparable to a field sobriety test to measure intoxication. Agent Wade testified that youth was not the only factor considered; she also considered the other youthful-appearing individual in Escobedo's car, the college campus area, and the fact the Campus Mart was "a high crime area for these types of offenses."

{¶ 11} Both Agent Hescht and Wade also testified that there were no vehicles blocking the exit of Escobedo's car. Agent Wade testified that she approached Escobedo's window, identified herself, and requested identification, but Escobedo "was free to leave at that point, because he could have driven away, his driver could have driven away at any moment."

{¶ 12} The state's final witness was Agent Sarah Valasek, an assistant agent-in-charge who supervised the field operation on September 10. Agent Valasek testified that the field operation targeted the activity surrounding the BGSU football game, and surveillance included area stores and carry-outs as places to buy alcohol for tailgating at the game. As supervisor, Agent Valasek's contact with Escobedo occurred after his arrest. Agent Valasek testified that Campus Mart was the source of numerous arrests for underage purchases. On the date of Escobedo's arrest, she testified that the agents had three vehicles in the Campus Mart parking lot, but no vehicles were moved to block Escobedo's car from leaving the lot.

{¶ 13} After the state presented its witnesses, Escobedo called Suhain (Sam) Al-Seleh, the general manager of Campus Mart and Erin Bell, the cashier who sold alcohol to Escobedo.

{¶ 14} Sam Al-Seleh testified generally about the customer base for Campus Mart, comprised mainly of university students between the ages of 18 and 25. He also testified about the training provided to cashiers, to ensure there are no sales to underage customers. Al-Seleh trained Erin Bell, and indicated he demonstrated the proper way to check identification, including looking "at the ID to make sure it looks legit" and reading "the reaction of the customer" to detect any behavior that concerned him. He learned about the arrests by watching surveillance camera footage of the parking lot.

{¶ 15} Erin Bell testified that she had worked at Campus Mart for about two and a half years, and completed online training in selling alcohol, with training repeated every six months. Bell described things she looked for in her examination of identification, like correct data, an image that looks like the customer, or the quality of the identification itself. She also testified that she observes a customer's body language.

{¶ 16} On September 10, she testified that she was aware liquor control agents were in the parking lot, surveilling the store, and she knew not to tip off any customers. Bell testified that she checked Escobedo's identification and did not note anything unusual about him. Bell indicated she only knew she was fooled after observing surveillance camera footage of the parking lot, "watching them be given tickets," and she

6.

had seen a handful of tickets in the time she worked at Campus Mart. Finally, Bell testified about citations she had received for selling to underage customers, both in the past and a present, pending citation.

{¶ 17} In addition to this testimony, Escobedo also testified briefly on his own behalf. He testified that he purchased the alcohol, then got in his roommate's car to leave. Before they could leave, however, Escobedo testified agents approached the windows on both sides and asked for identification, and additionally, agents pulled vehicles "in front and behind us, so, like, we physically couldn't leave." He stated that his roommate could not drive away for fear of hitting another vehicle or one of the agents on foot.

{¶ 18} Escobedo offered no other evidence, and the trial court heard closing argument. The state argued the agents had a reasonable suspicion that Escobedo was underage, based on his youthful appearance and the location of the underage purchase. Escobedo's trial counsel challenged the basis for the agents' suspicion, considering Agent Hescht watched him show the cashier an ID, which should have dispelled any suspicion regarding his age.

{¶ 19} In Robinette's case, the state presented the testimony of Agents Jessica Cerda and Haley Wade.

{¶ 20} Agent Cerda testified that on November 12, 2022, she and a partner were conducting operations at the Campus Mart when she observed Robinette exiting the store

7.

with a bottle of Orloff Vodka, visible through the plastic bag he carried. Agent Cerda testified regarding her experience and law enforcement career and based her observations on her training and experience. Considering Robinette's appearance, as well as the appearance of his young companions, Agent Cerda suspected he was underage. She described Robinette's observable physical attributes such as physical development, hairstyle, lack of facial hair, and clothing style. She testified that Robinette was wearing a hat, but she could still see his hair style, and along with his clothing and other features, determined he appeared underage.

{¶ 21} Agent Cerda approached Robinette's window on foot, as he sat in the driver's seat. She testified she had observed Robinette hand the alcohol to the female passenger in the front seat. She tapped on his window, identified herself as an agent, and requested identification. She testified that, when she asked for identification, she believed Robinette was not free to go. But Agent Cerda also indicated that she and her partner were not so close to the vehicle that they prevented Robinette from reversing out of the spot and driving away. Robinette did not drive away, but instead, rolled down his window and showed his identification, which was a vertical Ohio driver's license indicating Robinette was underage. When asked for the identification used to purchase alcohol, Robinette produced a fake ID from Indiana.

{¶ 22} Agent Wade then testified that she observed Robinette before he entered the Campus Mart and thought he appeared underage before walking into the store. Agent

8.

Wade also testified regarding her training and experience as a law enforcement officer, and described factors she considered in determining youthful appearance as follows:

> His body stature. You don't see a lot of the muscle development that a grown man would have. You don't see any facial hair that a grown man might have. You don't have a defined jawline. * * * His haircut was a youthful appearing haircut, as it was what a lot of college students wear or styled their hair at that time.

She later reiterated these considerations as "a lack of muscle development, a thinner stature, a less defined jawline like you would see with an older man, no facial hair, a younger haircut that was very similar to a lot of college students and high school students at that time." She indicated Robinette was wearing a sweatshirt, but she could still discern his stature.

{¶ 23} Agent Wade approached the vehicle's passenger side and she knocked on the front passenger window. Agent Wade requested identification of the front-seat passenger, who was holding the alcohol at the time, and also asked the rear passenger for her identification. Neither passenger had identification, and Agent Wade later determined both females were minors.

{¶ 24} Both agents were asked about activity reports created on September 10, 2022, authored by Agent Anasia Greathouse, Agent Valasek, and Agent Hescht. Specifically, the agents were questioned regarding notations for various locations, within

9.

the reports, noting multiple age-checks with no violations found. Agent Cerda acknowledged that, consistent with the activity reports, there were occasions she requested identification from a youthful-looking person who was not underage. Agent Wade also acknowledged that, on other occasions, she approached and checked identification of youthful-looking individuals who were not underage.

{¶ 25} Robinette presented no testimony but moved to admit the activity reports into evidence. The trial court admitted the exhibits without objection. The parties then presented closing argument.

{¶ 26} The state argued that the agents approached Robinette after observing him leave the carry-out with a bottle of vodka and, based on his youthful appearance supported by their observations of his clothing and hair styles and his physical stature, had a reasonable suspicion that he was underage. In support of the reasonableness of the stops, the prosecutor cited precedent addressing curfew violations, in which officers had reasonable suspicion of a violation based on youthful appearance after curfew hours.

{¶ 27} In response, Robinette's trial counsel argued the agents' suspicion was supported only by subjective, gut feeling, and not by any objective factors. In support, counsel referenced the activity reports, which he argued demonstrated the agents were often wrong in judging whether a person was underage, rendering their determinations of youthful appearance unreliable and insufficient to support a reasonable suspicion.

10.

{¶ 28} The trial court took the motions under advisement, and in Robinette's case, granted the parties leave to supplement with caselaw addressing issues raised concerning curfew cases.

{¶ 29} On January 23, 2023, the trial court denied each motion to suppress in separate written decisions. The trial court found the weight of credible evidence supported a finding of reasonable suspicion regarding Escobedo's and Robinette's youthful appearance, justifying a consensual encounter between the agents and Escobedo and Robinette. The trial court determined, based on the totality of the circumstances, that a minimal intrusion, or approaching on foot and requesting identification, did not violate the constitutional rights of Escobedo and Robinette.

{¶ 30} Following denial of their motions, Escobedo and Robinette each entered no contest pleas to their respective charges, and the trial court found them guilty and imposed sentence. This appeal followed.

### III.    Assignments of Error

{¶ 31} In appealing the trial court's denial of his motion to suppress, Escobedo asserts a single assignment of error:

> The trial court erred in denying [Escobedo's] motion to suppress, as the evidence obtained against him was obtained in violation of his rights under the Fourth and Fourteenth Amendments to the United States

11.

Constitution and Article I, section 14 of the Constitution of the State of Ohio.

Robinette also asserts a single assignment of error relative to his motion to suppress:

The trial court erred when it failed to grant the [Robinette's] motion to suppress and erred in finding that there were reasonable and articulated suspicions based upon objective determinations by the agents for stopping [Robinette] in his vehicle and performing a search without a warrant.

{¶ 32} As the assignments of error raise an identical issue, we shall consider the assignments of error together.

## IV.    Analysis

{¶ 33} The trial court found the greater weight of credible evidence supported a finding of reasonable suspicion, justifying a brief, consensual encounter to check the identification of Escobedo and Robinette.  Based on this evidence, the trial court denied the motions to suppress of Escobedo and Robinette.  On appeal, Escobedo and Robinette challenge the trial court's factual findings and argue that the facts did not support a reasonable suspicion regarding their age.

{¶ 34} Our review of the trial court's judgment, denying the motion to suppress in each case, presents a mixed question of law and fact. *State v. Davis,* 133 Ohio App.3d 114, 117, 726 N.E.2d 1092 (6th Dist.1999), citing *State v. Smith,* 80 Ohio St.3d 89, 105, 684 N.E.2d 668 (1997); *see also State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372,

12.

797 N.E.2d 71, ¶ 8.  Because the trial court determines factual questions and is in the best position to consider credibility of the witnesses, we "must accept the trial court's findings of fact if they are supported by competent, credible evidence."  (Citations omitted), *Burnside* at ¶ 8.  However, we review the trial court's conclusions independently, and "without deference to the conclusion of the trial court" in deciding "whether the facts satisfy the applicable legal standard."  *State v. Hair,* 6th Dist. Lucas Nos. L-22-1164 and L-22-1165, 2023-Ohio-2422, ¶ 46, citing *State v. Wesson,* 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 40, quoting *Burnside* at ¶ 8.

{¶ 35} Both Escobedo and Robinette argue that the liquor control agents lacked a basis to approach and request identification.  Both challenge the agents' separate determinations of "youthful appearance" as subjective and lacking a factual basis.  Additionally, Escobedo argues Agent Hescht's observation that he showed a license to the cashier diminished any reasonable suspicion.  Robinette, in turn, cites to the numerous erroneous determinations of "youthful appearance" by the agents, in identifying underage persons, as demonstrating a lack of reliability and subjectivity of the agents' suspicions.

{¶ 36} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution protect against unreasonable search and seizure.  *Bowling Green v. Godwin,* 110 Ohio St.3d 58, 2006-Ohio-3563, 850 N.E.2d 698, ¶ 11, citing *Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89

(1996). However, not every interaction with police "implicates constitutional guarantees." *State v. Ruehl,* 6th Dist. Wood No. WD-05-092, 2006-Ohio-6054, ¶ 11, citing *United States v. Mendenhall,* 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

{¶ 37} The United States Supreme Court has recognized different categories of encounters, with differing standards that must be satisfied prior to restraint or search. These categories are a consensual encounter, an investigatory stop, and an arrest. *State v. Wallace,* 145 Ohio App.3d 116, 122, 761 N.E.2d 1143 (6th Dist.2001); *State v. Knicely,* 6th Dist. Erie No. E-13-049, 2014-Ohio-3437, ¶ 7, citing *Mendenhall* at 553 (additional citation omitted).

{¶ 38} There is no claim that agents approached Escobedo and Robinette to place them under arrest or to conduct a custodial interrogation. A custodial interrogation requires questioning "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *State v. Wilson,* 76 Ohio App.3d 519, 522, 602 N.E.2d 409 (6th Dist.1991), citing *Miranda v. Arizona,* 384 U.S. 436, 444, 96 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As no custodial interrogation is claimed, we must determine whether the agents approached Escobedo and Robinette to engage in a consensual encounter or to conduct an investigatory stop. The trial court determined there was a consensual encounter, but qualified the encounter as precipitated by

14.

reasonable suspicion. Both Escobar and Robinette argue there was an investigatory stop, lacking reasonable suspicion.

{¶ 39} A consensual encounter is one in which the person is free to walk away from police without answering, and generally occurs in a public place for the purpose of a conversation, or for police to ask for information or seek permission to conduct a search. *Knicely* at ¶ 9, citing *Florida v. Rodriguez,* 469 U.S.1, 4-6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984). "Any restraint of a person's liberty by physical force or display of authority by police negates the consensual nature of the contact." *Knicely* at ¶ 9, citing *Mendenhall* at 554.

{¶ 40} A consensual encounter becomes an investigatory stop when a reasonable person would not feel free to leave based on the officer's use of force or show of authority. *Wallace* at 121. The intent of the officer, moreover, is irrelevant, as the "test is objective and is based upon whether a reasonable person would have felt free to leave." *Id.,* citing *Mendenhall* at 554. Whether an encounter "changed from consensual to a seizure that triggered Fourth Amendment rights" is determined based on the totality of the circumstances under the facts of that case. *Id.* at 122, citing *State v. Johnston,* 85 Ohio App.3d 475, 477-478, 620 N.E.2d 128 (4th Dist.1993), citing *State v. Bobo,* 37 Ohio St.3d 177, 524 N.E.2d 489 (1988), paragraph one of the syllabus (additional citation omitted.).

15.

{¶ 41} In this case, the agents approached the vehicles of Escobedo and Robinette, showed their badges, and requested identification, delaying each appellant as they prepared to drive away from the carry-out. While the trial court deemed this a consensual encounter, the show of authority and request for identification could have been received as a command, viewed through the eyes of either Escobedo or Robinette. The trial court, apparently acknowledging this appearance of authority, also addressed the encounters as investigatory stops, and the parties presume an investigatory stop on appeal. Accordingly, we address the encounters between the agents and Escobedo and Robinette as an investigatory stop.

{¶ 42} An investigatory stop requires reasonable suspicion that warrants the brief detention. *See Terry v. Ohio,* 392 U.S.1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The reasonable suspicion standard is something less than the probable cause needed for arrest, permitting an "intermediate response" by police when confronted with a suspicious individual. *Bobo* at 180, quoting *Adams v. Williams,* 407 U.S. 143, 145-146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (additional citation omitted.); *see also State v. Hairston,* 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, ¶ 10, citing *United States v. Sololow,* 490 U.S.1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

{¶ 43} In addressing the requirement of "reasonable suspicion," The Ohio Supreme Court has acknowledged the standard as an "elusive concept." *State v. Anderson,* 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991).

16.

Since *Terry*, courts have struggled with the elusive concept of what comprises a reasonable suspicion that someone is engaging in, or about to engage in, criminal activity. "Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise." [*United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)]. Fleshing these terms out, courts have concluded that an objective and particularized suspicion that criminal activity was afoot must be based on the entire picture—a totality of the surrounding circumstances. *Id*. at 417-418, 101 S.Ct. at 694-695; [*Bobo* at the syllabus]; *United States v. Rickus*, [737 F.2d 360, 365 (3d Cir.1984)]. Furthermore, these circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold. *United States v. Hall* [525 F.2d 857, 859 (D.C. Cir.1976)]; *State v. Freeman* [64 Ohio St.2d 291, 295, 414 N.E.2d 1044 (1980)]. A court reviewing the officer's actions must give due weight to his experience and training and view the evidence as it would be understood by those in law enforcement. *Cortez*, supra.

*Anderson* at 87-88.

{¶ 44} In challenging "reasonable suspicion," in each case, Escobedo and Robinette both argue that a "youthful appearance" is highly subjective, and therefore,

insufficient to provide any objectively reasonable suspicion to justify an investigative stop to check identification. Both Escobedo and Robinette ascribe a "certainty" quality to the determination of what is objectively reasonable, challenging the reliability of the agents' determinations by citing either a record of inaccurate suspicions, contained within the agents' activity reports, or conflicting observations, based on Agent Hescht's observation that the cashier quickly looked at an ID before completing the sale of alcohol. Escobedo and Robinette also address "youthful appearance" as the only observation supporting the agents' investigatory stop in each instance and fail to address the other facts considered by the agents prior to initiating the investigatory stops.

{¶ 45} There is little precedent regarding the objective factors an officer might consider in assessing an individual's youth. In opposing suppression in Robinette's case, the state argued the application of precedent in curfew cases, in which an officer's determination that an individual appeared youthful, or too young to be out after curfew, was deemed sufficient to support an investigatory stop considering the totality of the circumstances. *See, e.g., Akron v. Fair,* 68 Ohio Misc.2d 40, 42, 646 N.E.2d 1205 (Mun.Ct.1994); *State v. Vaughters,* 8th Dist. Cuyahoga No. 2006-Ohio-2474, ¶ 12-13 (stopping "youthful-looking" adult on suspicion of curfew violation deemed proper *Terry* stop).

{¶ 46} In at least one curfew case, an appellate court has considered whether an officer's knowledge and experience could be deemed sufficient to support a reasonable

18.

suspicion based on articulable facts observed by that officer. In *State v. Nichols,* 3d Dist. Seneca No. 13-03-75, 2004-Ohio-2355, the Third District Court of Appeals considered an officer's knowledge and experience as a factor, and found:

> Herein, Officer Marquis testified that he believed Nichols was underage and breaking the local curfew law. He based this suspicion on Nichols' appearance and his knowledge and experience as a police officer. During the suppression hearing, the trial court was able to observe Officer Marquis on both direct and cross examination. The trial court was also able to personally observe Nichols' actual physical appearance. The trial court is in a better position than this court to judge the accuracy of Marquis' assessment of Nichols' appearance. The fact that a person appears to be under the age of eighteen and is out after curfew certainly gives rise to enough of a reasonable suspicion that illegal activity is afoot to permit a police officer to conduct an investigative stop.

*Nichols* at ¶ 7.

{¶ 47} In this case, the agents testified regarding their suspicion that Escobedo and Robinette were underage, identifying observable characteristics in appearance that distinguish youth from maturity. The trial court was in the best position to observe the agents' testimony, and consider the training and experience of the agents. Additionally, the agents testified regarding the context of the investigatory stop of appellant. The

19.

agents testified they were engaged in surveillance of the Campus Mart carry-out as part of their liquor control enforcement activities to detect underage violations, and they were not profiling random students to stop merely because they looked young. As part of their operation, the agents considered additional facts in forming a reasonable suspicion that illegal activity was afoot, such as the location of the carry-out as a known location for underage sales, the presence of companions who also appeared underage, and the fact that the purchases were made on the day of a home football game near the university campus where much of the undergraduate student body was under the legal drinking age.

{¶ 48} In evaluating whether the agents' investigative stops of Escobedo and Robinette were reasonable, we must consider the totality of the circumstances, as "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews,* 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). "And in determining whether the [agents] acted reasonably in such circumstances, due weight must be given, not to [an] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which [the agents are] entitled to draw from the facts in light of [their] experience." *Terry v. Ohio,* 392 U.S.at 27, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶ 49} Other jurisdictions have applied this test to suspicion based on underage violations of the liquor law. While only persuasive authority, we find it consistent with Ohio law in applying the standard in *Terry*.

20.

{¶ 50} In *State v. Beasley,* the Court of Appeals of Georgia considered an investigatory stop of an apparently intoxicated person who "looked 'pretty young.'" *State v. Beasley,* 270 Ga.App.638, 639, 607 S.E.2d 245 (Ga.App.2004). In *Beasley,* police conducted a check for underage drinking at a bar, and after observing Beasley inside the bar, appearing intoxicated and "pretty young," an officer asked for his identification. Initially, Beasley provided identification belonging to his brother, who was over 21 years old. Because the picture did not match Beasley, the officer persisted, and Beasley admitted he was under 21 years old. *Id.* at 638-639.

{¶ 51} The trial court granted Beasley's motion to suppress, noting the officer never observed Beasley holding a drink or consuming alcohol, providing "no probable cause to stop Beasley and ask for identification." *Beasley* at 639. In reversing, the Court of Appeals of Georgia noted that neither a consensual encounter nor an investigatory stop requires probable cause, with an investigatory stop needing only "a particularized and objective basis for suspecting the persons are involved in criminal activity." (Citation omitted) *Beasley* at 639. "Thus even though the officer only suspected, based upon Beasley's youthful appearance, that he was involved in underage drinking, 'an officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further,' including requesting identification." (Citation omitted) *Id.*

21.

{¶ 52} In *State v. Pritchett*, the Supreme Court of Kansas, likewise, reversed a lower court's suppression of evidence obtained through an investigatory stop of a young-looking person. In *Pritchett*, Kansas state liquor control agents entered the premises of a catered event to check for liquor law violations, and an agent observed Pritchett holding a cup that "had the odor of beer." Based on the agent's experience and "some training in spotting underage drinkers," the agent observed Pritchett's build "being thin and not yet filled out" and suspected Pritchett was under 21 years of age. *State v. Pritchett,* 270 Kan. 125, 126, 11 P.3d 1125 (Kan.2000).

{¶ 53} The agent approached Pritchett, identified himself as "an agent with Alcoholic Beverage Control," and requested identification. *Id.* Pritchett appeared nervous, and although he was wearing a wristband given to individuals over 21 years of age, Pritchett told the agent he had no identification. *Id.* The agent then informed Pritchett he would need to verify his age. As the agent attempted to take Pritchett into custody, pending proof of age, Pritchett fled on foot only to be found soon after, hiding at the venue. *Id.* at 127. The agent placed Pritchett under arrest and searched Pritchett's wallet for identification, finding two Kansas driver's licenses with different dates of birth; one license showed his actual age, under 21, while the other was a fictitious identification, used to procure the wristband. *Id.* at 126-127.

{¶ 54} In granting suppression, the lower court "concluded that [the agent] did not reasonably suspect that Pritchett was committing a crime" because he could not articulate

22.

a basis for suspecting Pritchett "looked young" using "objective criteria." *Id.* at 128. The lower court articulated a worry that "subjective criteria, such as looking young, [created] a greater possibility for abuse and/or mistakes." *Id.* at 129.

{¶ 55} The Supreme Court of Kansas disagreed, considering the officer's suspicion was based on objective criteria: "Pritchett, who was holding what appeared to be a beer, looked too young to legally possess an alcoholic beverage." The Court reasoned further:

> This is not to say that the agent might not have been mistaken. Looks can and do deceive. The amber-colored liquid in Pritchett's cup might have been nonalcoholic. However, [the agent] believed, based on his experience and training, that Pritchett was younger than 21 and, based on the look of the liquid and the social context, that Pritchett was holding a cup of beer. There was a sound articulable reason for him to believe that [Pritchett] was committing a crime.

*Pritchett* at 130-131. The Court concluded that, because the agent relied on observable facts, as opposed to hunch or intuition, the investigative stop was supported by reasonable suspicion. *Id.* at 131.

{¶ 56} Here, the agents identified observable facts that, viewed through their experience and training, provided the basis for reasonable suspicion to approach Escobedo and Robinette and request identification. The agents noted a "youthful

23.

appearance," but also considered the equally youthful-looking companions, the carry-out's reputation for underage sales, and the fact it was a game day, with tailgating all around the campus.

{¶ 57} The issue of "reasonable suspicion" should not be resolved "on the basis of any one of the factors" considered by a "reasonable and cautious police officer on the scene." *Andrews,* 57 Ohio St.3d at 88, 565 N.E.2d 1271.  However, in challenging the basis for reasonable suspicion, Escobedo and Robinette merely challenge the reliability of the agents' assessment of their appearance, arguing the agents were not always correct in their assessment or that Agent Hescht should have trusted the cashier's quick glance at identification as verification of legal age.  Their challenge, therefore, is to the trial court's factual findings on this one factor.

{¶ 58} It is well-settled law that the trial court is "in the best position to resolve factual questions and evaluate the credibility of witnesses."  *Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71 at ¶ 8, citing *State v. Mills,* 62 Ohio St.3d 357, 386, 582 N.E.2d 972 (1992).  Our determination, therefore, is limited to whether the evidence supports the trial court's factual finding.  Based on the evidence adduced at hearing, we find the weight of credible evidence supported the trial court's factual findings as to each motion to suppress.

{¶ 59} In the alternative, Escobedo and Robinette seek a determination that an officer's assessment of a youthful appearance may never provide the basis for reasonable

24.

suspicion. In support, they provide no precedent and fail to address applicability of the curfew cases cited by the state. We decline to establish such a categorical bar, precluding an officer's consideration of youthful appearance as a factor in determining reasonable suspicion for an investigative stop. In this case, especially, we find consideration of a youthful appearance, as viewed through the eyes of a trained and experienced law enforcement officer, could be a proper factor to consider in the context of an investigation of underage sales by liquor control agents.

{¶ 60} Accordingly, we find the separate assignments of error raised by Escobedo and Robinette not well-taken.

### V. Conclusion

{¶ 61} For the forgoing reasons, we affirm the judgments of the Bowling Green Municipal Court. Appellants Escobedo and Robinette are ordered to pay the costs of their respective appeals pursuant to App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

25.

Christine E. Mayle, J.      _____
                   JUDGE

Gene A. Zmuda, J.

Myron C. Duhart, P.J.     _____
CONCUR.                JUDGE

               _____
                   JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.